PER CURIAM.
This matter, involving the discipline and disability of a member of the Louisiana State Bar Association, began in May of 1981, when the Louisiana State Bar Association Committee on Professional Responsibility[1] filed a petition for disciplinary action against C. Edward Karst. Specifically, respondent Karst was accused of making false accusations against now retired Judge Guy E. Humphries, Jr. and against a fellow member of the Louisiana State Bar Association. The COPR recommended that the respondent be suspended for at least one year, with readmission predicated upon the respondent offering proof that he has overcome his mental and emotional instability.
After considering the record, as well as the oral and written arguments of counsel, this Court found the respondent knowingly made such spurious accusations, which warranted a one-year suspension:
... [W]e conclude that a review of the record supports the Commissioner’s finding that respondent Karst acted in violation of DR 1-102(A)(5) and (6). The facts of this case reveal that respondent accused Judge Humphries and Attorney [Minos] Simon of blackmail, fraud, corruption, and bribery in connection with the litigation captioned “Joe E. Fryar vs. C. Edward Karst,” bearing docket num *659 ber 97,699 in the Ninth Judicial District Court. Respondent caused said accusations to be published in the local press, and has continued to make public accusations against Judge Humphries to the present date.
Clearly, such groundless and irresponsible behavior constitutes conduct that is prejudicial to the administration of justice and reflects adversely upon respondent’s fitness to practice law.
[[Image here]]
A definitive period of suspension is particularly warranted here as the respondent has exhibited no remorse or retraction of his spurious and unfounded allegations against Judge Humphries and has in fact reiterated those allegations in a brief submitted to this court. Furthermore, the recklessness and utter disregard for the truth demonstrated by respondent Karst has adversely reflected upon the integrity of the legal profession and individual members thereof. Karst’s violations arise out of and are directly related to the practice of law.
LSBA v. Karst, 428 So.2d 406, 410-411 (La.1983).[2]
Further, in accordance with the recommendation made by the COPR, this Court conditioned the readmission of the respondent upon his proving that he has overcome his mental and emotional instability:
In imposing the present suspension we must also consider the Committee’s recommendation that respondent’s readmission be predicated upon proof of rehabilitation. Expert psychological and psychiatric testimony reveals that respondent Karst is presently functioning under a state of mental and emotional instability.
[[Image here]]
Considering that disciplinary action serves to protect the public and the bar from the actions of attorneys who have demonstrated professional irresponsibility, it is appropriate that respondent be required to obtain medical treatment and to prove that he can overcome his present emotional disability before he can return to the practice of law. Id., 428 So.2d at 411-412.
In 1984 and 1986, two applications for reinstatement filed by the respondent, or on his behalf, were denied.[3] A third application for reinstatement was filed on the respondent’s behalf in 1988. This third application offered no proof of the respondent’s rehabilitation, but merely referred to past treatment which was considered during the course of this Court’s review of the respondent’s first two applications for reinstatement.
In response to the third application, this Court appointed a Commissioner, Phillip A. Wittman, to conduct a full and complete hearing, take evidence, and report to this Court. Prior to convening the hearing, Commissioner Wittman ordered expert psychiatric examination of the respondent by Dr. Gene Usdin. Based upon evidence and testimony offered at the evidentiary hearing and a review of the psychiatric report prepared by Dr. Usdin, Commissioner Witt-man recommended against reinstating the respondent. Nonetheless, Commissioner Wittman noted reinstatement might be appropriate in the future, provided the respondent obtained appropriate psychiatric treatment.
In a later attempt to reassess Mr. Karst’s condition, Commissioner Wittman sent a letter to the respondent, asking the respondent to sign a medical release authorization. The authorization undoubtedly would have been used by the Commissioner to procure updated and pertinent medical records concerning the respondent’s condition. The correspondence was returned unclaimed. Commissioner Wittman then forwarded a second correspondence to the respondent, by certified mail, once again asking the respondent to forward appropriate medical authorizations. The authorizations *660 were apparently never signed and returned to Commissioner Wittman.
On August 6,1991, the Office of Disciplinary Counsel filed a “Motion to Close the Record [and] Deny Reinstatement.” In the motion, Disciplinary Counsel noted the respondent has continuously failed to cooperate in the Commissioner’s efforts to obtain medical records. On August 19, 1991, the respondent, in propria persona, filed a pleading entitled “Response to Disciplinary Counsel’s Motion to Close the Record[,] Deny Reinstatement and Respondent’s Motion to Annul Suspension.” In this response, the respondent provided no affirmative proof of his rehabilitation. Rather, the pleading attempts to relitigate the merits of the case which led to the respondent’s initial suspension.[4] That matter, of course, is final and, in any event, irrelevant to the current reinstatement proceedings.
Finally, on May 20, 1992, the Office of Disciplinary Counsel filed a “Motion to Supplement the Record and Deny Reinstatement.” Included in the motion is a transcript of an interview of Mr. Karst which occurred on WWL Radio in October, 1991. The motion also contains copies of letters from Mr. Karst to a number of Louisiana residents and officials.
In virtually all of these letters, as well as in the radio interview, the respondent threatens to execute the members of this Court. Excerpts of some of the threats are chronicled below:
Exhibit A. TRANSCRIPT OF RADIO INTERVIEW
Q. Mr. Karst, I’d like to go back to your controversy with the Supreme Court with the Judicial System in Louisiana. You were quoted and you say that this was taken somewhat out of context, but you were basically quoted in a newspaper article as saying that you would, if you needed to, kill the Louisiana Supreme Court. I wanted to give you the opportunity to explain that.
A. Sure, certainly. Well, I didn’t use the word “kill”. I used the word “execute”. Okay? Well, they are essentially — well, they are both homicide. But, you know, Governor Roemer has a TV commercial running where he’s bragging about having executed five citizens.
Q. So, you’re saying that’s a legal term.
A. Right. When you say “execute”, you’re talking about legal authority. Now two bishops of President Bush’s religious persuasion have reviewed the evidence and counseled me that neither they nor the church could say it would be morally wrong for me to summarily execute the entire Supreme Court of Louisiana.
Now that’s strong. Okay. They said it was between God and me. Okay. Now, as a military officer, I took a commission. Okay. Now when a person does that, they assume a lifetime obligation to the constitution to preserve protect and defend it.
Now, with that sworn duty. Okay? To preserve, protect and defend it, it becomes a duty to die, if necessary and the right to kill, if necessary for that limited purpose.
Exhibit B. Correspondence dated September 9, 1989 from C. Edward Karst to former U.S. Attorney John Volz:
[[Image here]]
These facts logically infer [the Supreme Court] are a self-confessed cabal of un *661 conscionable frauds with clear suicidal tendencies and so crazed with power and sense of immunity they fail to realize they have created an impasse that requires intervention by your office or the Commander in Chief because, as I told Dr. Usdin, ‘I’m going to heaven if it takes execution of the Supreme Court.’
Exhibit C. Correspondence from C. Edward Karst to “The Most Reverend Bible Schulte,” dated September 18, 1989:
He then compared my plight with the Roman Catholic, military officer who put the bomb in Hitler’s bunker after consultation with his Bishop. He counseled that as the Church could not sanction the execution of Hitler it also could not sanction my execution of the Supreme Court. However, neither he nor [sic] Church could say it would be morally wrong. You can signal agreement all moral precedents for War have been met by silence or inaction.
Exhibit D. Correspondence from C. Edward Karst to “Dr. John McAulay, Dean Emeritus,” Loyola University Law School, dated September 28, 1989:
How ironic it is that if Harry [Orleans Parish District Attorney Connick] simply let it be known there would be no prosecution if I can prove my cause I would not have to execute the Supreme Court.
Exhibit E. Correspondence from C. Edward Karst to Leslie J. Schiff, Esquire, Past President, Louisiana State Bar Association, dated September 29, 1989:
Incidentally, the Office of the Vicar General of the Archdiocese of New Orleans has yet to find error in the finding of the Bishop in Alexandria who, after reviewing the same evidence the COPR and the Supreme Court did, advised me neither the Church nor he could say it would be morally wrong to execute the Supreme Court of Louisiana.
Exhibit F. Correspondence from C. Edward Karst to LeDoux R. Provosty, Jr., Esquire, Past President, Louisiana State Bar Association, dated December 4, 1989:
... I checked out what I felt to be my moral and legal duty — summary execution of the Louisiana Supreme Courts— with the Episcopal Bishop of Western Louisiana following my suspension.
[[Image here]]
Therefore, I fervently pray the Supreme Court understands that their failure to do their duty will not excuse me from the discharge of mine to God, Country, Family and myself as certain degradation as an alcoholic appears to me to be more repugnant, humiliating and painful than life in prison for wasting the Supreme Court or death.
Exhibit G. Correspondence from C. Edward Karst to the Hon. Emile “Peppi” Bru-neau, Louisiana State Representative, dated December 29, 1989:
Should you hear I have “threatened” to kill the Supreme Courts don’t believe it. As now known by the Governor, the Attorney General, U.S. Attorney, District Attorney, Police Chief and others my execution of the Supreme Courts — perfectly legal and morally mandatory under Judeo-Christian principles of government and International Law — would be fulfillment of a thirty year Prophecy precipitated by character defects in government officials who failed to do their duty.
Exhibit H. Correspondence from C. Edward Karst to the Rev. Robert W. Muench of the Archdiocese of New Orleans, dated February 14, 1990:
Given my life story that includes a Jesuit education as the 1948 Gannon Regional Scholar to Fordham University and a JD from Loyola, military experiences, patent fraud connected with my suspension that was designed to cover-up a judicial scam of my property, review of all pertinent facts, and search of my soul I came to the conclusion it was God’s will and plan for my life to execute the Supreme Court.
[[Image here]]
Execution of the Supreme Court by bomb, bullet, or blasphemy is no challenge, would hurt me more than them and not even be satisfying.
Exhibit J. Correspondence from C. Edward Karst to the Hon. Harry Connick, *662 Orleans Parish District Attorney, dated November 26, 1990:
The smoke removed reason, which requires knowledge of all pertinent facts to understand, is that the Supreme Court has de facto and de jure ordered itself executed and appointed me its executioner.
Exhibit N. Correspondence from C. Edward Karst to the Hon. Charles “Buddy” Roemer, former Governor, State of Louisiana, dated December 18, 1990:
This matter will eventually go to a Grand Jury and/or Legislative Committee if it takes summary execution of the entire Louisiana Supreme Court no matter who happens to be sitting when it occurs.
The parallels between these more recent threats and the conduct which led to his disciplinary violations are compelling. Then, as now, Mr. Karst’s actions adversely impact the administration of justice in Louisiana, and also reflect adversely upon the respondent’s fitness to practice law. These threats, and Mr. Karst’s belief that his killing of judicial officers would be morally justifiable, offer abundant evidence that the respondent is presently mentally, morally and emotionally unable to function as an attorney or an officer of the courts of Louisiana.
Accordingly, in light of Mr. Karst’s failure to cooperate with Commissioner Witt-man, his failure to go forward with relevant evidence proving that he has been rehabilitated, his numerous threats against the lives of. members of the judiciary, and his evidently sincere belief that he is morally authorized to carry out his threats, Mr. Karst’s application for reinstatement must be denied.
Application for reinstatement DENIED.

. The Committee on Professional Responsibility (hereinafter referred to as the "COPR”) is the predecessor of the Disciplinary Board of the Louisiana State Bar Association.

. The “Disciplinary Rules" referred to in the opinion have since been replaced by the Rules of Professional Conduct, which became effective on January 1, 1987.

. Louisiana State Bar Association v. Karst, No. 84-OB-0586 (La.1984); Louisiana State Bar Association v. Karst, No. 85-OB-2404 (La.1986).

. In his response to Disciplinary Counsel’s motion, the respondent also attempts to refute Disciplinary Counsel’s contention that he has been uncooperative, and takes issue with whether or not Commissioner Wittman sent one of the aforementioned letters to him. Nonetheless, the motion clearly indicates the respondent is aware of the Commissioner’s effort to obtain updated medical records. Notwithstanding this knowledge, the respondent did not forward medical authorizations and/or updated medical records to the Commissioner.
it ill behooves the respondent to quibble about receipt of the aforementioned papers. The respondent was clearly aware of Commissioner Wittman’s interest in obtaining updated medical records at the time he filed his response, yet he did nothing to ensure that Commissioner Witt-man had the records, or at least had access to them. Even now, more than ten months since the respondent obtained undisputed knowledge of Commissioner Wittman’s desire to obtain updated medical records, the respondent has apparently chosen not to satisfy the Commissioner’s simple request.